IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| JOSEPH LONG, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No.: |
| v. ) | 2:15-cv-131-WC |
| ) | |
| COMERICA BANK ) | |
| ) | |
| Defendant. ) | |

BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The Plaintiff's claims for conversion and violations of the EFTA are supported by ample evidence for a jury to find in the Plaintiff's favor on those claims. The Plaintiff's claim for breach of contract, however, is indeed due to be dismissed.

## STATEMENT OF UNCONTESTED FACTS

Comerica Bank administers a debit card program under a contract with the United States of America Department of Treasury. The program is known as Direct Express. The program allows a recipient of social security benefits to elect to receive such benefits on a debit card, as opposed to receiving them in the form of direct deposit to a bank account or by check. The main point of the program is to allow the federal government to issue social security benefits without having to actually use or issue actual checks. A social security beneficiary today has two options to receive his or her benefits: either by direct deposit into a bank account or by use of the Direct Express card.

Comerica uses the services of a subcontractor, Xerox State & Local Solutions, Inc. ("Xerox"), to operate the Direct Express program. Xerox, as a subcontractor of Comerica, actually enrolls new participants, provides customer services, and communicates with the

enrollees. A recipient can enroll in the Direct Express program either directly with the federal government or by calling Comerica. The majority - 90% - of enrollees do so directly with the federal government. If someone enrolls by calling Comerica, the company requires the person to provide a social security number, date of birth, address, and phone number. These are the four authentication factors required by the government. Once that information is provided, then Comerica forwards it to the Social Security Administration. If the Social Security Administration validates the information, then Comerica changes activates the account and sends a debit card to the enrollee. If, though, the Social Security Administration does not validate the information, the account is never activated.

The Plaintiff never intended to enroll in the Direct Express program. The Plaintiff began receiving social security benefits in 2007. After receiving a few monthly checks, he quickly authorized the federal government to deposit his monthly benefits directly to his bank account at the Alabama State Employees Credit Union. Mr. Long received his benefits in this manner from that point forward and never asked the federal government to change it. Mr. Long received his deposit on the second Wednesday of each month.

Mr. Long did not receive his regular monthly deposit on Wednesday October 8, 2014. This was the first time that this had ever occurred, and Mr. Long called the Social Security Administration to see what occurred. He was told that he had enrolled in the Direct Express program and that he therefore needed to contact Comerica. Mr. Long had never heard of the Direct Express program as of that date, and he disputed what he was told. Nevertheless, using the number that the Social Security office gave him, he contacted Comerica on October 9th or 10th.

Mr. Long was asked by Comerica to verify his identity by providing certain information. Some of the information did not match what Comerica had on the account. Mr. Long informed Comerica that he did not enroll in the Direct Express program. He asked Comerica to return the funds to the Social Security Administration. Comerica informed him that the Social Security Administration would have to make that request, so Mr. Long went to

the Social Security Administration office in Montgomery shortly thereafter and asked for that to be done. Mr. Long also directed Comerica to send him a card so that he could try to obtain his benefits. His intent was to activate the card in order to gain access to the October funds and then discard it as he had directed that his future benefits be paid again by direct deposit. Mr. Long, however, was never able to activate the card after he received it.

Meanwhile, Xerox received an October 20, 2014, letter from the Department of Treasury to Comerica that stated:

> Based on conversations with your staff and the Social Security Administration, it has been determined that the ACH payment identified below was posted to an account at your financial institution which is inactive, inaccessible or erroneously established. On behalf of the Social Security Administration, I am hereby requesting that the transaction be returned through the ACH process with a return reason code of 'R16' (Account Frozen).

The letter then references the October 8, 2014, deposit by the Department of Treasury of $1,419 into the Comerica account opened in Mr. Long's name. Per the Department of Treasury's instruction, Xerox debited $1,388 from the account on October 20, 2014.[1] Comerica issued a check in the same amount to the Department of Treasury on November 14, 2014, and the government negotiated that check on November 17, 2014. Mr. Long ultimately received the $1,388 from the Social Security Administration in April 2015.

Someone enrolled Mr. Long in the Direct Express program on September 8, 2014. In order to do so, the person had to possess Mr. Long's social security number, date of birth, and address. These are the authentication items that the federal government directed Comerica to use in order to enroll recipients. With that information, an unknown individual enrolled Mr. Long.

---

[1] A total of $31.00 had been debited from the account. On September 23, 2014, an expedited card replacement fee of $13.00 was charged when someone (not Mr. Long) contacted Comerica about the card. Presumably, this was the identity thief. Another $13.00 card replacement fee and $4.00 expedited delivery fee were charged on October 10 when Mr. Long actually called.

After he learned of this, Mr. Long directed the Social Security Administration to again use direct deposit for payment of his benefits. He began receiving his social security benefits by direct deposit again in November 2014. Mr. Long has received them every month since by direct deposit with one exception. In June 2015, someone again falsely enrolled Mr. Long in the Direct Express program. Mr. Long became aware of it when he did not receive his regular deposit on the second Wednesday in June 2015. He again went to the Social Security Administration office in Montgomery. The officials told him that he had enrolled in the Direct Express program; Mr. Long told them that he had not. This time, however, the social security officials did not require him to contact Comerica. Instead, the Social Security Administration replaced his June benefit payments that same month.

Mr. Long does not claim any damages in this action stemming from the June 2015 event. His claims are limited entirely to the October 2015 event. It is undisputed that both events were initiated through some unknown person's unauthorized use of Mr. Long's personal information.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the pleadings, depositions, admissions, answers to interrogatories on file, together with any affidavits submitted, show that there is no genuine issue of material fact *and* that the moving party is entitled to judgment as a matter of law. In considering whether a "genuine issue" exists, "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 255 (1986).

## LAW AND ARGUMENT

I. **Conversion**

The Defendant next argues that, among other things, taking $1,388 from a man's bank account and holding such funds inexplicably for 25 days in the face of his numerous demands for such funds somehow does not constitute conversion. This is wrong. A claim for

conversion exists where there is "a wrongful taking or a **wrongful detention or interference**, or an illegal assumption of ownership, or an illegal use or misuse of another's property."[2] Where the converted property is cash, the Plaintiff must also prove that the cash at issue is "specific money capable of identification."[3] In this case, the funds that were converted were specifically identified in an individual account held by the Defendant, and "[s]o long as accounts at financial institutions are 'sufficiently segregated and identifiable,' this Court will generally allow a conversion claim to proceed."[4]

Regardless of how the account was created, there can be no question that the account and the money in it rightfully belonged to Joe. It was his property. The account was created from a single deposit ($1419 deposited on October 8th, 2014), from a single source of funds (Joe Long's Social Security benefits), for a single beneficiary (Joe Long). Comerica Bank wrongfully retained those funds in three ways.

First, when Joe tried to employ the only method they offered him to access his money – the debit card – Comerica refused him access because they would not recognize his real date of birth. (Hoeppner Depo., p. 49, 4-9). Instead, they relied upon the information supplied to them by some unknown "identity thief" and insisted that his date of birth was March 1st instead of March 10th. By holding his money and refusing to allow him access to it despite his having provided them on multiple occasions his authentic identification information, they wrongfully interfered with his benefits.

Second, when Joe, exasperated with trying to work with Comerica and their debit card system, demanded the money be returned to the SSA for deposit into his bank account, Comerica did not comply. As their memorandum points out, the Treasury Department demanded the return of $1,419 on October 20th, 2014 (Doc. 16-4). Comerica's statements refer to a "Debit Adjustment" of $1,388 on that same date indicating the removal of that amount from Joe's account. However, Comerica did not get around to actually sending the money

---

2  Covington v. Exxon Co. U.S.A., 551 So.2d 935 (Ala. 19889) (emphasis added).
3  Hunnicutt v. Higginbotham, 35 So. 469 (Ala. 1903).
4  Hensley v. Poole, 910 So.2d 96 (Ala. 2005).

back to the government until November 14, 2014, when it wrote a check for $1,388. The check was, apparently, deposited on November 17th, 2014. (Doc 16-5).

Comerica's own deposition testimony offers no explanation for this 28-day delay between the time the funds were taken from Joe and the time they were received by the government. (Hoeppner Depo. p. 25, 4). Yet as Comerica's telephone call records and Mr. Long's deposition show, Joe made numerous calls to the Defendant during this period to ask where his money was. They knew he wanted it. They knew they had removed it from his Direct Express account and put it into their own. Yet they sat on it for almost a month. They had no right to retain his money for such a long time, yet they did so anyway. This is a "wrongful detention or interference" if there ever was one.

Third, they did not return the full $1,419 that belonged to him. They only returned $1,388. The difference, they say, are charges imposed for sending two replacement cards and an expedited delivery fee. Mr. Long only requested a replacement card once – when he initially spoke with them on October 9th (or 10th). Yet they charged him twice for this "service." The $13.50 charged for a card he never asked for nor received may not seem a large sum of money, but the measure of his damages is a question of fact for the jury.

The Defendant also claims that it is not liable for any wrongful retention of Joe's money because after Comerica finally sent Joe's money back to the Treasury:

> "[t]he federal government then held the money for approximately five months before returning it to the Plaintiff, for reasons unknown to either party. There is no evidence that Comerica ever wrongfully took, detained, interfered with or otherwise converted the Plaintiff's money to the bank's own use." (Doc. 17).

In other words, the Defendant contends that since the government held onto Joe's money for about 5 months, the Defendant should be excused from any liability for the one month that it kept Joe's benefits from him. This is absurd. Consider: if Mr. Wint stabs Mr. Bond one time with a knife, is Mr. Wint immunized from liability simply because one Mr.

Kidd comes along and stabs Bond five times? Of course not. There may be legitimate questions as to how much of Joe's damages are the fault of Comerica Bank and how much of it is the fault of other parties, but the apportionment of damages is clearly a question of fact for the jury to decide, and not a matter for summary judgment.

Comerica next attempts to blame everything on Uncle Sam in another way: it argues that it cannot be held liable for conversion because "[t]he federal government...exercises exclusive dominion and control over the Plaintiff's benefit money until the moment he receives it. Comerica exerts no control, but instead acts as the federal government's agent in administering the benefits." (Doc. 17)

This is simply not true. If that were the case, then there would have been no need for the Treasury's October 20th letter to Comerica. It could have simply clicked a button or snapped a finger and the money would have returned to its coffers. But of course, that isn't what happened. In fact, the government's attempt at asserting some sort control over Joe's funds was actually thwarted *by the Defendant.* Rather than turning over $1,419 on October 20, 2014 as the government requested (Doc. 16-4), Comerica held onto the money for another 25 days, and then wrote a check for $1,388 – noticeably less than what the government told them to send. (Doc. 16-5).

Furthermore, "it is thoroughly well settled that a man is personally liable for all torts committed by him, consisting in misfeasance – as fraud, conversion, acts done negligently, etc.--notwithstanding he may have acted as the agent or under directions of another."[5] Comerica Bank is a contractor, hired and compensated to perform a job: to receive government benefits on behalf of U.S. citizens, to hold those funds in trust, and to make those funds available to the beneficiaries through the use of debit card accounts. If Comerica screws something up for a federal beneficiary, the Nuremberg defense avails them nothing: they are liable.

II. **Electronic Fund Transfers Act**

---

5  Crigler v. Salac, 438 So.2d 1375 (Ala. 1983).

A. **There *was* an "Account" as defined by 15 U.S.C. §1693a(2).**

The Defendant believes that Regulation E applies "only to accounts for which there is an agreement for EFT services." (Doc 17). This is just an incorrect reading of the law. Nowhere in the EFTA or Regulation E does it state that a contract or agreement is a prerequisite for the law's protections. On the contrary, the law's coverage is expansive:

"This part [12 C.F.R Part 1005] applies to any electronic fund transfer that authorizes a financial institution to debit or credit a consumer's account." 12 C.F.R. §1005.3(a). And:

"The term "electronic fund transfer" means **any transfer of funds** that is initiated through an electronic terminal, telephone, computer, or magnetic tape for the purpose of ordering, instructing, or authorizing a financial institution to debit or credit a consumer's account." 12 C.F.R. §1005.3(b).

In this case, someone made a telephone call to Comerica's call center to enroll Joseph Long into Comerica's Direct Express program. (Hoeppner Depo., at p. 12, 13-20.). As a result of this telephone call, a Comerica Bank account was created in Joe's name and his Social Security benefits were electronically deposited into that account on October 8, 2014. (Doc. 16-3). The deposit of funds into Joe's Comerica account was clearly an "electronic fund transfer" within the meaning of the EFTA and Regulation E.

The fact that the account was opened by someone other than Joe Long for a possibly nefarious purpose is immaterial. Comerica Bank does not open Direct Express accounts for businesses, scammers, foreign states, municipalities, or anyone other than individuals. And the Direct Express program, as the Defendant admits, exists for the purpose of receiving and holding federal benefit payments. The language "for personal, family, or household purposes" is a reiteration of a phrase identical to nearly[6] every other consumer credit protection statute: the Fair Debt Collection Practices Act—at 15 U.S.C. §1692a(5); the Truth in Lending Act—at 15 U.S.C. §1602(i); the Fair Credit Reporting Act—at 15 U.S.C. §1681a(d)(1)

---

6  The sole exception being the Equal Credit Opportunity Act, whose anti-discrimination purpose requires that applicants for business credit be protected from discrimination as well.

(A); and the Credit Repair Organizations Act—at 15 U.S.C. §1679a(2). This phrase is also used in other consumer protection statutes such as the Magnuson-Moss Warranty Act-- at 15 U.S.C. §2301(1). The reason this phrase is used is to make it clear that the protections (and regulatory burden) of a consumer protection statute do not apply to corporate entities and business enterprises which, presumably, are 'big boys' able to fend for themselves. The phrase "for personal, family, or household purposes" is the language Congress uses to declare a law to be a consumer protection statute.

This legislative purpose is explicitly stated at the very beginning of the EFTA: "The primary objective of this subchapter, however, is the **provision of individual consumer rights**." 15 U.S.C. §1693(b) (emphasis added). The rest of the Act and the regulations issued thereunder must be read with that purpose in mind. And how does the Defendant's proposed interpretation fit with that purpose? They argue that the EFTA's consumer protection provisions must be denied to the victims of identity theft, while the perpetrators of such theft would remain protected *if* they committed fraud for a personal, household, or family purpose. The victims of identity theft are the consumers who need the protections of the error resolution provisions most of all! Yet the Defendant asks the Court to pervert the law into something directly at odds withs purpose. We can't do that.

Defendant's denial of the existence of an "account" is also flatly contradicted by all of the evidence. What did they establish in Joe Long's name, if not an "account?" Why are their monthly statements labeled "**Monthly Account Statement?**" (Doc. 16-3). Why does their October 2014 statement display an October 8, 2014 deposit "For the benefit Recipients of the Account?" (Doc. 16-3). Why does the reverse side of the account statement refer to Mr. Long's "account" six times? (Doc. 16-3) Why does Comerica's Direct Express website invite cardholders like Mr. Long to "Login to your Card Account?"[7] The answers to these questions are the same: because Mr. Long had an account with Comerica Bank. Their corporate representative's deposition testimony corroborates this on numerous occasions. (Hoeppner

---

7   https://www.usdirectexpress.com

Depo., at p. 7, 3; p. 8, 18; p. 11, 2; p. 12, 8; p. 16, 2; p. 21, 10; p. 23, 22-23; p. 24, 16; p. 25, 8-10; p. 28, 11; p. 29, 20; p. 35, 9; p. 38, 1; p. 42, 8; etc.)

B. **There was an "Account" as defined by 12 C.F.R. §1005.15**

Even if the Court finds Mr. Long's account not to be an "account" defined by 12 C.F.R. §1005.2(b)(1), he certainly had an "account" as that term is defined by 12 C.F.R. §1005.15, which states:

> "(a) *Government agency subject to regulation.* (1) A government agency is deemed to be a financial institution for purposes of the Act and this part if directly or indirectly it issues an access device to a consumer for use in initiating an electronic fund transfer of government benefits from an account, other than needs-tested benefits in a program established under state or local law or administered by a state or local agency. The agency shall comply with all applicable requirements of the Act and this part, except as provided in this section.
>
> (2) For purposes of this section, the term "account" means an account established by a government agency for distributing government benefits to a consumer electronically, such as through automated teller machines or point-of-sale terminals, but does not include an account for distributing needs-tested benefits in a program established under state or local law or administered by a state or local agency."

This regulation was written to make clear that corporate or government entities involved in federal benefit payment accounts were required to comply with Reg. E and the EFTA. As the Consumer Financial Protection Bureau – the federal agency charged with interpreting the EFTA - puts it: "In March 1994, the [Federal Reserve][8] Board amended Regulation E to extend coverage to electronic benefit transfers (EBTs) issued by government agencies. 59 FR 10678 (March 7, 1994). The Board also amended Regulation E to deem a government agency an "institution" for purposes of the regulation. 12 CFR 1005.15(a). While EBTs became subject to most of the requirements of Regulation E, the Board exempted government agencies providing EBTs from the requirement of providing a periodic statement, so long as the agency makes the consumer's account balance readily available by

---

8   Prior to the passage of the Dodd-Frank Act, the Federal Reserve was the agency authorized with interpretation and rulemaking under the EFTA. That authority has since passed to CFPB.

telephone line and electronically, and the agency provides a written sixty day account history upon request."[9]

In other words, just because an account that receives government benefits might not meet the traditional definition of a bank account, you still have to follow the rules. Regardless of who or what caused the account to initially be created, there is no question that the account was established for the purpose of distributing Joe's government benefits electronically. That being the case, the Defendant was and is required to comply with all of Regulation E's error resolution procedures. They didn't do that for Joe, and they are liable.

C. **There were numerous "errors."**

Regulation E tells us just what is an "error" within the meaning of the EFTA:

'(a) *Definition of error*—(1) *Types of transfers or inquiries covered.* The term "error" means:

(i) An **unauthorized electronic fund transfer**;

(ii) An incorrect electronic fund transfer **to or from** the consumer's account;

(iii) The omission of an electronic fund transfer from a periodic statement;

(iv) A computational or **bookkeeping error** made by the financial institution relating to an electronic fund transfer;

(v) The consumer's receipt of an incorrect amount of money from an electronic terminal;

(vi) An electronic fund transfer not identified in accordance with §1005.9 or §1005.10(a); or

(vii) **The consumer's request for documentation** required by §1005.9 or §1005.10(a) **or for additional information or clarification concerning an electronic fund transfer, including a request the consumer makes to determine whether an error exists** under paragraphs (a)(1)(i) through (vi) of this section.'[10] (emphasis added).

A comparative perusal of this regulation and the evidence in this case shows that the Defendant's handling of the Plaintiff's account was rife with errors, quite literally from the

---
9    Advanced Notice of Proposed Rulemaking, May 2012. Docket No. CFPB-2012-0019.
10   12 C.F.R. §1005.11(a).

very inception of the account to the present day.  For one thing, the account itself was opened erroneously.  The Defendant hopes to blame some purported "identity thief" for the entirety of this error, but the Defendant's own testimony and records indicate that it never verified the Plaintiff's real date of birth.  (Hoeppner Depo. p. 49, 4-9; p. 55, 16 – p. 56, 7).   This was a "bookkeeping error" under 12 C.F.R. §1005.11(a)(1)(iv).

The initial transfer of money into the account was itself unauthorized.  This is an error under both 12 C.F.R. §1005.11(a)(1)(i) and (ii).

Similarly, Comerica's removal of $1,388 from his account on October 20, 2014 was an "incorrect EFT from his account" per 12 C.F.R. §1005.11(a)(1)(ii) in two ways.  First, they were supposed to debit $1,419, but they didn't.  Second, they did not actually remove the funds until November 14th.  In light of the fact that Comerica *was* holding Joe's money for a month after they said they'd sent it to the Treasury, Mr. Long's repeated demands for an explanation as to the whereabouts of his money was perfectly reasonable, and was most certainly a "notice of error" within the meaning of 12 C.F.R. §1005.11(b).  Even though Mr. Long did ask them to return his money on October 20th, they didn't do it.  This was also an error.

### D. **The Error Resolution rules must be followed even when no error was made.**

The Defendant contends that "without an error" the Defendant had no duty to follow the error resolution procedures required by the EFTA and Reg. E.  This is just incorrect.  There doesn't have to be an actual error – just an explanation "why *the consumer believes* an error exists"[11] or a request for information or documentation that may help the consumer figure out if there has been an error.  This is codified at 12 C.F.R. §1005.11(a)(1)(vii), which clearly contemplates the situation where a consumer notifies a financial institution of a potential error which ultimately is determined not to have committed.

In this case, Joe made approximately twenty telephone calls to the Defendant

---

11   12 C.F.R. §1005.11(b)(1)(i) (emphasis added).

attempting to resolve the numerous errors that he perceived to have occurred with respect to his account. (Long Depo. p. 40, 1-5). Each of his disputes and requests for information was a notice of what Joe clearly believed to be an error, such as an explanation of why his money was sent to them in the first place. Or an explanation of the $1,388 "DEBIT ADJUSTEMENT" listed on the October account statement they sent him. Or why they sent his card to the wrong address. Or why they sent him a card that he couldn't activate because they refused to recognize his real birthday. Or why his money was not received by the SSA, or why they told him they sent his money to SSA on October 20, 2014, when in fact they did not send it until nearly a month later. Joe also specifically asked on at least one occasion for documentation relating to Defendant's October 20 withdrawal of funds from his account. (Long Depo. p. 98, 18 – p. 99, 2). All of these were notices of error, or at the very least, requests for "additional information or clarification." So the duties under 1005.11 were clearly triggered in this case. Comerica just chose to ignore them and now is scrambling to find any way to avoid being held accountable for not following the law.

 E. **There was at least one EFT from Joseph Long's Account.**

Defendant's final argument is that "because Plaintiff never activated his card and never attempted to use it, no claim under Section 1693h exists. 15 U.S.C. §1693h says that Defendant is liable "for all damages caused by—

**(1)** the financial institution's failure to make an electronic fund transfer, in accordance with the terms and conditions of an account, **in the correct amount or in a timely manner** when properly instructed to do so by the consumer..."[12] (emphasis added).

As the Defendant points out, the removal of funds from his account on October 20, 2014 was ultimately the result of Mr. Long's own request. (Doc. 17, pg. 17, lines 6-7). He instructed Comerica to send his money back after first exhausting his efforts to use the card and the Comerica Bank account which had been created for him. (Long Depo. p. 95, 2 – p. 96, 17). This was an instruction from the consumer to make an electronic fund transfer.

---
12 15 U.S.C. §1693h

Comerica did not make this transfer in the correct amount (they sent back $1,388 instead of $1,419). Comerica did not make this transfer in a timely manner (they made it 25 days after instructed to do so). Or at the very least, whether a 25-day delay in processing an electronic fund transfer is timely or not is a question of fact for the jury to decide.

   III.   **Conclusion**

Joe Long did nothing wrong. Through no fault of his own, his primary source of income was diverted into a Comerica Bank account. He immediately attempted to resolve this problem. First by trying to work with Comerica's Direct Express program, and when that failed (again, through no fault of his own), he asked the Defendant to give him his money back. They did not. The deprivation of these funds, albeit temporary, was genuinely damaging to him. When he notified them that he believed mistakes to have been made, they had a duty to undertake an investigation and report back to him the findings of their investigation. They didn't. Instead, he was left in the dark for months. They have clearly violated the EFTA and committed common law conversion. They must compensate him.


   RESPECTFULLY SUBMITTED this 9th Day of October, 2015.


/s/ Judson E. Crump
Judson E. Crump, Counsel for Plaintiff
Judson E. Crump, PC
250 Congress St
Mobile, AL 36603
251.272.9148
judson@judsonecrump.com